Laban V. Stonecipher, Appellee, v. National Life and Accident Insurance Company, Inc., Appellant.

Gen. No. 10,128.

436

Opinion filed April 18, 1947. Rehearing denied June 23, 1947. Released for publication June 23, 1947.

MORGAN, PENDARVIS & MORGAN, of Peoria, for appellant.

McGRATH & COPELAND, of Peoria, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.

On April 16, 1943 Laban V. Stonecipher filed his complaint in the circuit court of Peoria county seeking to recover money alleged to be due him from the defendant, National Life and Accident Company and praying for an order directing the defendant to continue making payments to him of $20 per week during his lifetime. The basis of the suit is an alleged oral contract averred to have been made by the defendant acting through E. G. Ross, its district manager at Huntington Park, California and his superintendent, C. A. Manning of the same office, by the provisions of which, defendant obligated itself, in consideration of plaintiff's voluntary retirement from the service of the company to first determine his financial needs for the balance of his life and then to pay him a reasonable allowance therefor.

The defendant answered the complaint admitting that plaintiff had been employed by it for many years and admitting that certain monthly payments had been made by it to him subsequent to September 1937 but denied that he had resigned as alleged in the complaint and denied all of the allegations of the com-

plaint as to any promise made by it to the plaintiff to pay him any allowance of any kind or character. After the issues had been made up the cause was referred to the master in chancery who took the evidence and reported his findings to the court. The master found that the plaintiff was first employed by the defendant in 1912 but only worked for the company a short time; that he was re-employed in 1915 and remained in the employ of the company until September 27, 1937 when he resigned; that about March 5, 1938 plaintiff again went to work for defendant and continued until September 12, 1938. The master further found that an oral contract was made by the defendant as alleged by the plaintiff and that it was a valid and enforcible one; that the financial requirements of the plaintiff for house rent and living expense was between $87 and $90 per month; that the company recognized its liability under the contract and paid thereunder the sum of $20 per week for either 22 or 24 weeks from September 1937 until the plaintiff returned to work in March 1938; that after he ceased work in September 1938 he received $15 per week from the company until July 18, 1942. The master further found that plaintiff's financial requirements had not changed since March 1938 and inasmuch as the defendant had paid the plaintiff only $15 per week from September 1938 to July 18, 1942, that there was therefore due the plaintiff the further sum of $5 per week for these 200 weeks or a total of $1,000 and that plaintiff was also entitled to receive $20 per week from July 18, 1942 to the date of the decree, being 204 weeks at $20 per week or $4,080. These amounts of $4,080 and $1,000 aggregate $5,080 and this is the amount of the judgment rendered by the chancellor.

Upon the hearing before the chancellor the master's report was approved and a decree rendered finding that there was due the plaintiff from the defendant said sum of $5,080 to and including June 15, 1946 and

that the plaintiff was entitled to receive from the defendant $20 per week from June 15, 1946 until the plaintiff's death. A money judgment was rendered in favor of the plaintiff and against the defendant for said sum of $5,080 and this appeal is prosecuted by the defendant to reverse this decree.

The complaint charged and the answer admitted that on various occasions prior to the time plaintiff ceased to work for the defendant, the company had adopted a policy whereby some provision would be made for its veteran employees and in its answer the defendant stated that in 1937 it had adopted a plan for retirement benefits for certain of its employees but the details had not been settled and the plan as finally worked out became operative on January 1, 1939 and was applicable only as to active employees then in its service and was based upon some contribution from the earnings of the employees. There is no contention upon the part of counsel for the plaintiff that the plaintiff is claiming any rights under this retirement program.

The plaintiff testified that in September 1937 he was agent for the company located at Huntington Park, California and that his business was to solicit new policies of insurance for the company and to collect premiums that were not brought to the office. He testified that Ross, the manager of the district, told him that the company wanted him to resign and that if he would, the company would ascertain his financial needs and pay him an income for life sufficient to care for his needs; that he relied upon this promise, complied with that request and resigned; that after he resigned in 1937 the west coast territorial manager told him of the life pension arrangement and discouraged his returning to work but he insisted on going back to work and did so and while an employee of the company the Long Beach, California district manager reaffirmed the agreement previously made to pay him an income for life and relying upon that

promise he again resigned. The plaintiff's testimony was in a measure corroborated by his wife and they both testified that they were told by district representatives of the company that the payments he would receive would not be called a pension but would be called disability payments because of a law in Tennessee that prohibited the payment of pensions.

The several district officers of the company testified and each denied that he had ever made the statements attributed to him by the plaintiff and his wife and each testified that he had no authority to make any such arrangement with the plaintiff and the plaintiff himself testified that he knew that no one of them had any such authority and he admitted that he had no agreement of any kind with any of the executive officers of the company at its home office.

The record discloses that the company paid the plaintiff $20 per week for 22 weeks commencing October 2, 1937 and ending March 5, 1938 and in connection therewith district manager Ross testified that in 1937 while plaintiff was in the employ of the company he told him that he needed medical attention and should go on disability; that this was agreeable with the plaintiff and he resigned and the $20 per week which was paid to the plaintiff during the 22 weeks after September 27, 1937 consisted of $10 paid as a disability claim under a policy held by plaintiff and an additional $10 was paid as a voluntary disability allowance determined by the home office and that such payments were standard procedure in cases of disability. The record also shows that for two hundred weeks after the plaintiff left the company in September 1938 the company paid the plaintiff $15 per week or a total of $3,000. The explanation of these payments by the officers of the company is that they were voluntary disability allowances made by the company and charged by the company against the face value of a group life insurance certificate held by the plaintiff and which the company required the plaintiff and

his wife to assign to the company. Each time these fifteen dollar payments were made, the plaintiff executed a receipt therefor, each receipt reciting that the payment to the plaintiff is "voluntary disability allowance" and during the 22 weeks between September 1937 and March 1938 when plaintiff was receiving $20 per week he either executed receipts or indorsed checks indicating that the amount he received was for disability allowed or a claim. In explanation of the questionnaire which Superintendent Manning helped the plaintiff to fill out in 1937, this officer of the company testified that it was submitted to the home office of the company for the consideration of the officers there upon the question of disability payments.

The chairman of the board of directors, the president of the company and several of its vice presidents and other executive officers of the defendant at its home office in Nashville, Tennessee testified upon this hearing that they knew a voluntary disability allowance was paid by the company to the plaintiff but each testified that he had no authority to make any such agreement as claimed by the plaintiff and that no such authority could legally be given because a life pension without contribution by the employee was prohibited by law in Tennessee.

The record also discloses that under date of August 16, 1933 the company issued a letter directed to all district managers which announced the policy of the company to voluntarily pay a disability allowance to disabled employees based upon the length and quality of service rendered by the employee but that any payments so made by the company would be entirely voluntary on the part of the company.

The record also shows that the plaintiff on October 13, 1937 executed an instrument designated "claimant's statement" which disclosed that the plaintiff was, at that time, disabled because of hernia and ulcerated teeth and that he was being treated by Dr. Burns and by Dr. Cooper and by a dentist,

Dr. Everett and on September 8, 1938 forms were submitted to the home office of the company by the district manager of the company at Long Beach, upon which the home office authorized the payment of a voluntary disability allowance and this allowance was paid at the rate of $15 per week until $3,000, the face value of Group Policy No. 420 was exhausted. Plaintiff was fully advised of the manner the company was handling this matter. He had assigned this group policy to the company and on February 17, 1942 he was advised by the manager of the casualty department that these $15 voluntary disability payments would cease in July 1942, inasmuch as these payments had been charged against his group life insurance since October 1938 and that by July 1942 the face of that policy would be consumed.

While plaintiff claims that he resigned in 1937 and again on September 13, 1938, the weight of the evidence is that he did not resign voluntarily. The records of the company show that he ceased work in September 1938 by mutual agreement; on September 12, 1938 he wrote the president of the company: "Mr. Lesinba, manager here, informed me that I am to be finaled from Debit 24 as of this week, September 12. He gives as his reason that I am not physically able to do the work necessary to make the requirements. This is doubtless true. The men who are doing well, work day and night and one must have stamina and resiliency of youth to stand it. I feel that I am able and capable of doing clerical work and I am confident that I can give you good service in that capacity. Because I am not able financially to quit work, I am asking if you could place me in a clerical position in the Home Office."

On September 9, 1939, on September 15, 1939 and again on October 5, 1939 the plaintiff wrote the officers at the home office asking to be re-employed. In his letters of September 9, 1939 he states that he was "finaled from a debit" a year before and placed

on disability. In his letter to another officer, written the same day, he states that he would accept employment any place in the company where the company feels that he would be of service. "My income," he wrote, "has been very small. I need very much to work." Again in June 1942 he wrote the company applying for work. If his contention is true that he resigned in consideration of receiving $20 per week for life, some reference to that agreement and the fact that he was only receiving $15 per week would certainly have been made. These letters, in our opinion, are inconsistent with his present contention.

The only reasonable conclusion that can be arrived at from a consideration of all the evidence in this record is that the plaintiff severed his connection with the company at its request because of his inability to earn his wage or make the requirements the company demanded; that the company, although not obligated to do so under any policy or contract he had with it, did pay him voluntarily the aggregate sum of $3,440; that plaintiff knew that there was no liability to him under his policies and so did the company and he at all times up until the company discontinued its payments to him of $15 per week accepted said payments as a voluntary contribution from the company and knew that they were not being paid to him nor did he accept them as a partial payment upon any contract he had with the company to pay him $20 per week as long as he lived.

While counsel for the plaintiff concede that the alleged agreement upon which plaintiff bases his suit was not made by any authorized representative of the company, counsel argue that the company thereafter ratified it by making the weekly payments hereinbefore referred to. The records in the home office and the receipts and instruments executed by the plaintiff refute any claim that they were being made in pursuance of the provisions of any contract to pay plaintiff $20 per week for life.

The decree rendered is contrary to the weight of the evidence. The chancellor erred in not sustaining appellant's exceptions to the master's report and in not dismissing the complaint. For that error the decree is reversed and the cause remanded.

*Reversed and remanded.*